Good morning, Your Honors. May it please the court, I'm Rick Pepperman on behalf of the Defendant Appellant at BP Exploration Alaska, and with the court's permission, I would like to reserve three minutes for rebuttal. Your Honors, to understand the alleged fraudulent misstatement at issue in this action, and equally importantly, to assess whether that alleged statement was made with scienter, a brief understanding of the Prudhoe Bay Royalty Trust is required. The trust is an oil and natural gas royalty trust that was formed in 1989 as a Delaware business trust. Its units are traded on the New York Stock Exchange under the symbol BPT. According to paragraph 128 of the complaint, all of the trust's corporate functions are carried out by its trustee, the Bank of New York, from Bank of New York's offices in New York City. When the trust was created in 1989, the appellant, BP Exploration Alaska, or BPXA, transferred a royalty interest in approximately 16% of the production from Prudhoe Bay to another BP affiliate called the Standard Oil Company. This royalty interest was transferred through an agreement called the Overriding Royalty Conveyance. Standard Oil then transferred that same royalty interest to the trust through a separate agreement called the Trust Conveyance. This royalty interest is the sole asset and the sole source of dividends for the trust. Now, as an issuer of securities, the trust is required to make periodic filings with the SEC. And the BPXA was aware of that, I take it, when they entered into this transaction? When the trust was formed in 1989, BPXA was certainly aware that the trust thereafter was going to be required to make quarterly and annually filings with the SEC. Which would include the language at issue in one of the agreements? Well, Your Honor, the answer to that is yes, but no. One of the agreements, the agreement that gives rise to the alleged misstatement here is the Overriding Royalty Conveyance. The reason why that agreement is attached to the trust SEC filings is because the Overriding Royalty Conveyance defines what is the royalty interest that is the trust's sole asset. Oh, whatever. I mean, the fact is, at least from the district court's perspective, BPXA knew that its representation in that document would be part of the, and it was, it was part of the trust SEC filings. And she said, she found that once it's out there, BPXA certainly had reason to know that. Why is it there? Why does the SEC require it to be there so that investors can analyze the structure of the deal? Well, let me take the different parts of that, Your Honor. I think that question really frames largely the issues on this appeal. I hope so. First of all, in terms of a representation, what we're dealing with in the contract is not a representation. It's not a rep or warranty in the contract. Rather, it is a promise of future performance. It is a promise that BPXA will. Why isn't that a representation? Well, that is a representation of what you agree to do in the future rather than a representation of what is an existing fact. And that was being represented year after year. Well, and that gets, I think, Your Honor, you know, to the second point. What's critical here is a combination of two factors. It is, one, that the alleged misstatement is, in fact, a promise of future performance. But equally importantly, that the contract was attached to the SEC filing of a third party that was prepared and signed by the Bank of New York. Let me ask you about that, though. I'm more sympathetic, at least initially, to the first argument that it's really a downstream promise, that it's not a current representation or warranty, although my mind is open on that. But what do you do with the language in the agreement that says that BPXA is authorized to make and, quote, shall be responsible for, end quote, all of the trust's SEC filings? What does that mean? All right. Well, that language you're referring to, there are four agreements that are attached to the trust's SEC filings. And actually, I think it's notable that the agreements aren't actually attached. They're incorporated by reference back on their prior attachment, because they've been attached every year since the trust was born. That's an irrelevant fact, though. I mean, you're not suggesting that prior incorporation somehow inerts or cuts off. Well, here's what I'm trying to get to, Your Honor. It's very relevant in two respects. It's relevant first in terms of whether a reasonable investor would view a single ancillary provision of a contract attached to a third party's SEC filings as a representation of fact. But more importantly, it's highly relevant, and I would submit dispositive, of the scienter question under this Court's decision in Glaser Capital Management. Because in Glaser Capital Management, then, you're dealing with a situation where a company had attached to its own 10K a merger agreement. And the claim was that the company was not in compliance with a rep and warranty in the merger agreement. And the Court, in looking at whether scienter was alleged, looked at the context in which the alleged misrepresentation had been made, and concluded that the plaintiffs had not alleged sufficient facts to give rise to a strong inference that there was a corporate officer at the company who was both, one, aware of the misrepresentation, and two, was aware of the underlying facts that contradicted the misrepresentation such that there would be scienter. Here. That was a pleading problem. And you still haven't answered my first question, which was really, what does that language mean that BPXA is responsible for the trust filing? I think, Your Honor, that the trust agreement itself and the trust SEC filings answer that question. If you look at them, Your Honor, what BPXA's role is, what it's responsible for doing as part of the trust's preparation of its SEC filings, is to provide information about the royalty interests. In other words, to provide information about existing production from Prudhoe Bay, what anticipated future production is going to be from Prudhoe Bay. And if you look through the trust's SEC filings, when there is a fact attributed to BPXA, it always is what is the quantity of existing production, for how long in the future production is supposed to exceed 90,000 barrels a day, such that the trust will continue to have a royalty interest, for how long in the future the trust can be expected to pay a royalty interest. There are no statements anywhere in the trust's SEC filings, and one of them is included in the appendix, about BPXA's maintenance or operation of Prudhoe Bay. There's no representation in the trust's filings to that effect. And all of this, Your Honor, again, I think goes back to what is in many ways, I think, the easiest question on this appeal, which is scienter, which I submit can be determined based on the Glaser Capital Management decision, because the same pleading problems that existed there exist here, only here it is a worse case for the plaintiffs, because here the contract was not attached to the company's own 10K, which had been signed by the company's CEO and CFO, it was attached to a third party's 10K. Here the contract was signed 16 years before the alleged misrepresentation supposedly took place, not a contract that was signed right when it was released to the marketplace. Here the contract at issue is not a material contract to the issuer, BP PLC, whereas the merger agreement in Glaser Capital Management was highly material to the issuer. And what the court said in Glaser Capital Management is that facts have not been alleged that give rise to a strong inference that there is a single corporate officer at the issuer who was both aware of the misstatement and knew enough of the facts that undercut it such that that officer could be accused of being engaged in deliberately reckless or conscious misconduct. You know, it's notable that... How does the plea agreement fit into that analysis? Well, first of all, Your Honor, in terms of the misstatement that's left in the case, it doesn't fit in at all because there is no nexus alleged between the plea agreement and the alleged misstatement that was made through the trust SEC filings. I mean, what the allegations in the plea agreement go to was the mental state of the company in maintaining and operating the Prudhoe Bay oil transit lines. The plea agreement doesn't show anything about the mental state of the person who supposedly made the misstatement through the trust SEC filings. You know, I think in some ways in briefing this, we got caught up in sort of an interesting academic question, which is the wrong question for purposes of deciding the case. The question that the parties debated is whether a plea agreement, which is predicated on a mental state of ordinary negligence, can give rise to a strong inference of highly reckless or conscious misconduct. Well, it pled to facts. It didn't just plead to... I mean, that's the label that was put on it, but didn't it plead to certain facts? It did, Your Honor, but if you read the plea agreement as a whole, which I think the court needs to do under TELAVS, I mean, the plea agreement is clear that what BPXA did was negligently maintain and operate at Prudhoe Bay. And there are statements in there, there are facts that go both ways. In terms of positive statements, there are statements in the plea agreement that BPXA believed that internal corrosion was a low risk and that BPXA believed that it did not need to pig the pipelines more frequently. But more fundamentally, what the plaintiffs need to do here is through their pleadings connect that mental state to someone at BPXA who is responsible for the trust SEC filings. On a pleading stage, how are the plaintiffs supposed to know who was involved? I think Glaser Capital Management and the Seventh Circuit's maker case make this clear. They don't need to identify the specific person. They don't need to say it was John Smith. But what they do need to do is allege facts that give rise to a strong inference that there is someone, there is someone who was both substantially involved in the preparation of the trust SEC filings, such that any misstatement through them could be attributable to him, and that same person knew the facts that were contrary to the alleged statement so that that person could have the mental state of deliberate recklessness or conscious misconduct. You're saying they would have to plead in such a way that it's plausible and likely that the person who made the misstatements or had the negligent state of mind, if you will, referenced in the plea agreement was knowledgeable about the SEC disclosures? It had to be more than reasonable and plausible. Under the PSLRA, it would have to be a strong inference. And it couldn't be negligence. I want to identify who you think they need to hang the scienter on. Does it have to be whomever they identify? It has to be a corporate executive who is knowledgeable about the prior representation and also was knowledgeable about the facts. Right, so they could put one. It had to be the same person. It had to be the same person. And I think all the Court of Appeals decisions on that point are clear. And how would they know that? Well, I think in situations where there would have to be something in the trust SEC statement that says that, and that's why the inference can't exist here, because the trust SEC statement doesn't refer to anyone from BPXA being involved in the preparation. But the trust documents that set it up said, as Judge McKeown pointed out, that BPXA would be responsible. You identified a limitation on what they were responsible for furnishing. But how would the plaintiffs know that? And why is it implausible at the pleading stage to set up this syllogism that the plaintiffs argue? Again, it would have to be a strong inference. But you have to find that someone who was directly involved in the maintenance and operation of BPXA, such that they would know all the underlying facts in the plea agreement, assuming that's sufficient. That that same person was also involved every quarter in working with the Bank of New York in coming up with the information necessary for the trust to make its SEC filings. It would be the same person who was, you know, it would have to basically say that I think it's Maureen Johnson, who is the senior vice president responsible for Prudhoe Bay, that she was both involved and aware of all the intimate details of the maintenance and operation of Prudhoe Bay. And then also each and every quarter was responsible for reviewing, signing off on, and contributing to the trust SEC filings. And that nexus doesn't appear anywhere in the complaint. It doesn't appear anywhere in anything in the record. It doesn't appear anywhere in the trust SEC filings. I'm not sure how they would know that. That's my problem. At the pleading stage. Well, I think in part the reason for that, Your Honor, is that the alleged misstatement that they're reaching for occurs in such an obscure context, and it's such a limited issue. So the bigger the corporation, the more insulated it is from it. No, I don't. Because they'll fragment responsibility. Not at all, Your Honor. I think this Court said it right in Glaser Management. What is critical for Sienter is the importance of the misstatement and how dramatically false or not it is. And part of the problem for the plaintiffs on the pleadings here is they're not dealing with an important statement by BPXA such that knowledge of that statement can be attributed to senior management of the company. Rather, they're dealing with a misstatement that occurs in a very obscure context. A single ancillary provision of one of four contracts attached to a third party's SEC filings. Thank you. Thank you. You used up more than your time, but we'll give you some time for rebuttal. Good morning, Your Honor. May it please the Court. My name is Thomas Dubs for the lead plaintiffs. We submit that the Court's decision below should be affirmed with respect to the that she correctly found that there was adequate Sienter there. I also, in my time, would like to address three other statements that we've appealed from that were rejected by the District Court, which we think were in error. First of all, a few background points. In our colleague's brief, he says on page 17, to be sure a defendant that makes actionable misstatements cannot avoid Section 10B liability simply because another party disseminated those statements. So that goes to the issue of whether the filer of the statements, who is the trust, is really of any significance. Here, the maker of the statement is clear. The maker of the statement was BPXA. They're the one who made the statement. There's really no question about it. Now, there is a question as to whether there's enough, and we've pled enough as to whether BPXA has Sienter. No question about it. But to try to push this down the road of this is a problem of third parties, aiders and abettors, all that road, that's a dead end. It's conceded that BPXA made the statement. It was delivered by the trust year after year after year to the SEC. It's also clear from the trust documents. They have no employees. They have no directors. They have no nothing. They're essentially a check writing operation. And they have very limited authority. The key ---- Let me cut to the heart of my problem, okay? Fine. The heart of my problem is that you have an agreement that basically says we're going to operate by prudent standards. And you could have all kinds of statements to that effect that are in agreements. And it would be typical that because of the relationship between and among these various parties that you would attach that to your SEC filings because it's a foundational document. My question is how is a document signed some years before that makes prospective statements as to what one of the contracting members might do, how does that form a present-day misrepresentation? The court below was clearly correct in applying Brody and applying Burson that the repetition, the drumbeat of that statement, every quarter for many, many years turned that into a misrepresentation because it created the impression among the investment public that they were complying with the prudent operator standard. Now to get back to the question that you asked my colleague, which I do think is pivotal, is this. And this is a very atypical case. It's very unique. They obligated themselves to be responsible for that. They undertook the obligation to monitor it. If it became true at any point, they had a duty to correct it. So they said they were responsible. If it became untrue, they had the obligation to correct it. But that's a second-order question. The top-level question is they were responsible for the accuracy of the SEC filings. Let me ask you a question. If you have, let's just take something like a requirements contract. And sometimes those end up being the foundation for securities lawsuits because people don't actually have the ability to meet the supply or can't meet the requirements contract. And there's representations that you'll meet your obligations, et cetera. But what if you enter into a requirements contract, you know, 20 years ago, and you say, you know, we're going to meet your requirements, whatever they are, every year. That's all you say is that's what it is. Is that the basis for a securities lawsuit because every year you file it and then one year it doesn't happen? No, it would not be. What's the difference between that and your suit? The difference is the assumption of responsibility and direct responsibility for the statement. You're not just filing contracts that could be material. You're taking a specific obligation on with respect to a specific task, namely SEC filings. It's not just a requirements contract in the ordinary course of business. And I would submit it's a red herring to suggest that if you have a contract, such as Your Honor posited, year after year, you probably wouldn't have to monitor that unless you made the independent representation you would be responsible for it. And that's what makes this case different. They said they were responsible for the filings. That's what makes it different. But you see, that's where I'm having some disconnect that I'm still trying to piece everything together. It's one thing to say you're responsible for the filings, but then to say, and therefore even filing a preexisting contract thereby becomes a forward-looking statement. I mean, yes, they're responsible for the filings, and isn't this contract foundational to the relationship between the two? So they file it, but I'm still looking for the link, which is why then that contract becomes an actionable statement. I mean, I think you came closest to it when you said it's because they do it over and over. But is that really what we should look to, that it's repetition makes it a current-day statement? It's the importance of the statement. And if you go through all these trust documents, which are exceedingly boring, but if you go through them, you will see that there are essentially two kinds of documents. There are the documents that deal with the trustee, and those essentially say how are my checks going to get cut, how does the oil get calculated, and all that. But if an investor wants to say, you know, this is the largest oil field in North America, who's really going to run it, who's going to operate it? You've got to go to the operating agreement. And the operating agreement clearly says that's in BFPXA's bailiwick, and the statement that's critical about the standard by which they're going to maintain it is the prudent operator statement. So materiality is not the issue. And to get back to your honors question of what makes it different, repetition makes it different, importance makes it different, the size of the problem makes a difference. I mean, BPXA has one raison d'etre, which is to run this oil field. So it's not like those cases. It's not laser, which my colleague likes, where you had 20% of the revenues from overseas, and the argument was that the CEO should know about alleged bribes in the Philippines. It's not like that. And, by the way, the key issue while I'm on laser, the key word in laser, which distinguishes it from this case, is the word surreptitious. That was surreptitious. This is the opposite of surreptitious. BPXA had knowledge, as the judge below found. They had knowledge in 04 with the whistleblower going to London. They had, with respect to the Western oil spill, they had a September 05 report that went into detail about how things were getting worse. I'll get into the details of how that tracks into one of the statements in a moment. But they clearly had that information. And even if I accept your Honor's hypotheticals, and even if we say, which I don't think is correct, that this is just a routine contract, because under the securities laws, we don't parse these things like routine contracts or 19th century libel cases. It's the impression. It's the impression that the marketplace gets, and that's what this Court has clearly said in Brody, clearly said in Burson, and that's historically been the law. So one can't just sort of say, oh, it's a requirements contract, it's this or that, it's not important, it's stuck in the SEC filings. It's not just stuck in the SEC filings, and it's repeated, and then to pick up on a theme, even if one were to adopt that suggestion, which I do not, then one has a duty to correct. Even if, let's assume a machine was filing that statement. If a machine was filing that statement, at some point somebody had to turn off the machine. And that's the duty to correct. And so we can debate about when that should have been. Should it have been in 04 when some guy from Alaska who worked with workers got himself an interview with a director of one of the world's largest companies in London and said there's a corrosion problem? Was it September 05 when they looked at the Western line and they found all kinds of problems? You can debate when it should be, but clearly there was knowledge about that, and that, if nothing else, I'm assuming a theory I don't agree with, that should be enough to turn off my hypothetical machine. Let me turn now to, besides, one further thought on Glaser, by the way. One of the important parts of the Glaser analysis under Tell Labs was that the CEO who signed the reps and warranties knew that this was part of a merger deal, and he knew there would be due diligence on it. So not only did you have surreptitious keyword payments overseas, but you had a reasonable inference that this would be found out, so therefore that was not deemed to raise a compelling or an inference under Tell Labs. Let me turn now, in my time remaining, to the statements which are properly before the court, and let me do it in a slightly unorthodox fashion by arguing what is usually the second-level argument and argue that these were reckless, rather than making the argument that they were consciously false. Because I think there are two pivotal facts that weave across not only this whole case, but certainly those three statements. Is this going to say enter, or what? This is going to say enter. It's number one that the plea agreement says that they knew they had insufficient inspection data as to the east field, which is where the second leak was. They stipulated to that. The second statement is we have pled in paragraph 90, in omission by the company, that smart pigging is the only accurate way to determine corrosion. So if you know those two things, you know that you don't have information on the east line, and you know that you can really only detect, really get that degree of accuracy that you need to make statements, is through pigging, and you haven't done pigging, then the issue becomes, and this is the more global issue, under what circumstances does a company have to investigate to see if it has a reasonable basis before it goes out into the marketplace and tries to calm the marketplace in what everyone would agree was not a great situation after the first leak. And we submit the law as they either have to say something, like we're looking into it, we don't know, or if they say something, they can't say it recklessly, and if they haven't done their homework, and they know that they have insufficient data as the plea agreement stipulates as to the eastern field, they have no business making the statement. And that runs through all three of the statements that are here before. Now let me turn briefly to the statements. The one dealing with a low manageable corrosion rate. The problem there is the district court was quite correct in saying that we had alleged that it was a sharp and rapid spike, and she said there's no inconsistency between that and the statement. And in isolation, she's probably right. What she didn't do, and where she made an error, is she has to look at all the things we pled before she can make that tell-lapse threshold judgment as to whether there's a cogent inference. So when you say there's low manageable corrosion, you're saying it's low, you're in effect saying because it's low, it's manageable, so therefore this other spill that just happened a little while ago is not a big deal. And that's what you're trying to do to calm the marketplace. Now what was said, and these are alleged in paragraph 89, the rate of corrosion rose from 3 to 32 in one year. The locations grew from 1 to 7 in one year. The thickness of the- Counsel, you're going to run out of time. I'd like to, we have your briefs on that. Could you come back to the scienter and address at the pleading stage what the scienter requirement is? Counsel has said that you have to have identified the same person who would know about this representation and also know and be involved in the misstatements that you're talking about. Well, first of all, the idea that the same person, we have to find out who had scienter who gave the piece of paper to the trustee that I don't deal with. What we have to show is that somebody in authority had scienter within the company at the relevant time. Now we don't know who that is, but we've tried, so it's not like we're just saying somebody out there must know something. We allege that Mr. Marshall, who was the president who was later fired, was responsible. We also allege that Ms. Marshall, based upon her statements and her position, she was obviously conversant in that. And Mr. Marshall said before Congress that he was responsible for everything that happened at BXPA. So that's not a bad starting point. He admitted that he was responsible for everything. Now that doesn't, we can't pin that down, that he's responsible for either turning off the switch of the machine or continuing the drumbeat of the misrepresentations. But we think an inference can be shown based upon not only the size of what happened, which is totally different from Glazer and some of the other cases, though the core operations doctrine is not what we solely rely on. We've got a lot more than that, as the district court held. If you put all those together holistically the way that Justice Ginsburg said we must, Intel Labs, we do have the compelling inference of Scienter. As to one or more senior officers at BP, that Scienter is imputable to the company, and we're dealing with a company statement. We're dealing with a company statement, and the company made the statement, but in order to show Scienter under the respondent superior theory of Scienter, we have to find and identify at least one person who we allege had Scienter. Now we said that's Mr. Marshall, we said that's Ms. Johnson, and that's in paragraphs 28 and 29 of the complaint, and you put that together with Mr. Marshall's blanket admission with respect to responsibility before Congress that's in the complaint, we think that, together with the importance of the core operation, gets us there for certainly the prudent operator standard, but also some of the other things. The September 05 incident report is also vital. That's the one I just went through as to the increase, the dramatic increase from 04 to 05 in the situation. They don't deny they had actual knowledge of that. They say that they stipulated that they didn't know what was going on in the eastern field, but they did stipulate that they knew those things about that dramatic growth. As to the western statement, western operating area where the first leak occurred, and those same reasons apply to the other statements about highly corrosive conditions that were unique. The government was saying it wasn't unique. The court below incorrectly characterized our position on that statement as one as we were debating what was the structure of the pipeline. Not so. We were talking about what was going on inside the pipeline. We talked about they knew. How do you wrap up with, you know, we understand because we've read all the briefs. It's fine. So I think it would be helpful if you want to wrap up and tell us what you want us to focus on. Certainly, Your Honor. Well, I want you to focus particularly on the three statements which our colleagues have not addressed, and I think that the district court was clearly correct in her analysis of Scienter, and if you look at Scienter, not only in her first opinion, but the motion on reconsideration, you get a holistic view, which is what Justice Ginsburg said it was supposed to do, that not only did something terribly wrong here, but that there is a cogent inference of Scienter, and a cogent inference of Scienter doesn't have to be better than the defendants. A tie goes to the plaintiffs at the pleading stage, and to bring this back to where Your Honor began, under the court's decisions under 9B, you are given leeway if the information is solely in the possession of the defendants, and the bottom line here is that this information as to who actually authorized this specific statement on Tuesday afternoon or who said don't turn off the machine or who had the knowledge that led the decision don't turn off the machine, there's no way we could know that. No way we could know that. Thank you. Thank you, Your Honor. You can have a minute and a half for rebuttal. Judge McGoon, would it be okay to let the appellant have a couple of minutes more in light of the appeal he went substantially over time? What I'd like to start by is addressing the question that Judge Fischer raised about what happens when you can't identify the corporate official who supposedly made the statement with Scienter, and I'd like to start by referring to the Seventh Circuit's maker decision. On page 710, there Justice Posner says it is possible. Judge Posner. Posner said it is possible to draw a strong inference of corporate Scienter without being able to name the individual who concocted and disseminated the fraud. Suppose that General Motors announced that it sold 1 million SUVs in 2006 and the actual number was zero. There would be a strong inference of corporate Scienter since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false. Again, it's an announcement that's so dramatic that there's a strong inference that some senior corporate official with knowledge approved the statement. Then this court- You're focused on, as I understand your argument, you're focused on, are you saying that the announcements made that caused the market to, or they claim caused the market to drop, or are you focused on going back to the statements about the prudent management? Well, what I'm focused on is the, under Judge Peckman's decision, the sole misstatement that's in the case, which is the claim that the attachment of the overriding royalty conveyance to the trust SEC filings is a statement or certification by DPXA that it was an ongoing compromise. So you are focused on that. You're saying that's just an obscure representation, and whoever made statements later on wouldn't have been aware of those representations, prior representations. Yes, and, Your Honor, I think that reasoning comes directly from Glaser Management. There, the court, referring again to the same General Motors hypothetical in Maker, said that there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least some, with some emphasize, corporate officials knew of the falsity of the statement. But there, the court said that because the alleged misstatements were just three statements in a 60-page legal document, that given that limited context, given the context in which the misrepresentation occurred, that the PSLRA required the plaintiff to please center with respect to those individuals who actually made the false statements. You can't rely on an assumption that there must be some corporate official out there who both was aware of the statement and knew it to be false if it's not one of those highly important dramatic statements, such as the GM hypothetical. And as the court said in Glaser Management, when you're dealing with statements, they're just excerpts of long legal documents attached to SEC filings. You can't assume that senior management was aware of those statements. And Mr. Dubs' distinction from Glaser Management just doesn't work. He said the thing about Glaser Management was that it was surreptitious. But in Glaser Management, it's very similar to this case. In Glaser Management, the issuer had entered into an agreement with the Department of Justice which said, quote, that the company was aware of a high probability that its foreign sales agents or distributors paid or offered something of value to government officials in violation of the FCPA. So the company had pled that it was aware of a high probability of that. But the problem in Glaser was that the allegations weren't sufficient to sort of connect the left hand and the right hand to plead that there was some single officer of Glaser who was aware of the alleged misstatements made through the legal document and then also aware of the underlying facts that contradicted it. Just one thing, if the court has any questions. The plaintiff raised three misstatements that the court below rejected in her motion to dismiss. I mean, I submit that those statements aren't properly before the court because a cross petition for permission to appeal wasn't filed pursuant to Federal Rule of Appellate Procedure 5B2. We have, I think that's been well briefed, and as you know, it's a bit of a murky area in the Federal courts. But that was well briefed, and it's a point that we do have in mind. And I would submit that even if the court concludes there's jurisdiction to reach those, it's not proper to sort of inject those issues into the appeal in the response brief such that the appellants are left to respond to them only in their reply, which is why you have cross appeals and cross petitions so that issues can be presented in a more orderly fashion to the court. Thank you. Thank you both for argument on a very interesting case. We appreciate your argument this morning. The case of Reese v. BP Exploration is submitted.
judges: McKeown, Fisher, Gould